CARLOS ZENÓN, PEDRO ZENÓN ENCARNACIÓN, CACIMAR ZENÓN ENCARNACIÓN, RAFAEL RIVERA CASTAÑO, CARMELO FELIZ MATTA, PAUL O'LEARY, MIGUEL A. VÁZQUEZ, ANTONIO CORCIÓN, MARÍA A. TORRES ROMÁN, ROSA H. GARCÍA TORRES, REGALADO MIRÓ CORCINO y SANDRA I. REYES ECHEVARRÍA, demandantes y recurridos, *v.* JUAN R. MELECIO, PRESIDENTE DE LA COMISIÓN ESTATAL DE ELECCIONES; LCDO. CARLOS LÓPEZ, COMISIONADO DEL PPD; PEDRO FIGUEROA, COMISIONADO PNP; DAMARIS MANGUAL, COMISIONADA DEL PIP; COMISIÓN ESTATAL DE ELECCIONES, y ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandados y peticionarios.

*Número:* CT-2001-1          *Resuelto:* 5 de noviembre de 2001

---

598

*Roberto J. Sánchez Ramos, Procurador General, Vanessa Lugo Flores, Subprocuradora General,* y *Laura Lis López Roche, Procuradora General Auxiliar; Luis F. Estrella Martínez,* Comisionado Electoral del Partido Nuevo Progresista; *Ramón L. Walker Merino,* abogado de Juan R. Melecio, codemandado; *Carlos J. López Feliciano,* Comisionado del Partido Popular Democrático; *José J. Nazario de la Rosa, Pedro J. Valera Fernández* y *Carlos E. Gómez Menéndez,* abogados de la parte apelada.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

A instancias del Estado Libre Asociado de Puerto Rico (en adelante E.L.A.), expedimos auto de certificación mediante nuestra Resolución de 17 de octubre de 2001, respecto al recurso de apelación presentado por dicha parte ante el Tribunal de Circuito de Apelaciones (KLAN–2001–01022). A través de dicho recurso se impugna la sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 15 de octubre de 2001, en la que se decretó la inconstitucionalidad de la Ley Núm. 423 de 27 de octubre de 2000 (16 L.P.R.A. sec. 957 *et seq.*), según enmendada por la Ley Núm. 457 de 28 de diciembre de 2000.

I

El 13 de septiembre de 2001 los demandantes, todos residentes y electores del Municipio de Vieques, presentaron una Urgente Petición de Entredicho Provisional, Interdicto Preliminar e *Injunction* Permanente y Sentencia Declaratoria, mediante la cual impugnan la constitucionalidad de la Ley Núm. 423, *supra,* según enmendada por la Ley Núm. 457, *supra.*

Los demandantes sostienen que dicha legislación in-

fringe sus derechos al sufragio y a la libertad de expresión. Aducen, además, que discrimina en su contra por razón de su ideología política, invocando para tal alegación las disposiciones del Art. II, Sec. 2, y el Art. VI, Sec. 4 de la Constitución del E.L.A., L.P.R.A., Tomo 1; lo resuelto en *Sánchez y Colón v. E.L.A. I*, 134 D.P.R. 445 (1993), y *P.A.C. v. E.L.A. II*, 150 D.P.R. 805 (2000), por cuanto la aludida ley no contiene una tercera alternativa que incluya la opción que prevaleció en la consulta local celebrada en Vieques el 29 de julio de 2001; esto es, la terminación inmediata y permanente de las prácticas militares y los bombardeos de la Marina de Guerra de Estados Unidos en Vieques, la salida inmediata de la Marina y la limpieza y devolución de las tierras viequenses a sus ciudadanos.

En particular, la petición argumenta que: (1) la celebración del referéndum federal requiere el desembolso de fondos públicos estatales de una manera vedada por el Art. VI, Sec. 9, de nuestra Constitución, L.P.R.A., Tomo 1; (2) la Ley Habilitadora no contiene una tercera alternativa que incluya la opción que mayoritariamente prevaleció en la consulta local celebrada en Vieques el 29 de julio de 2000, por lo que dicha ley les viola el derecho al voto, la libertad de palabra y discrimina contra ellos por razón de ideología política (Párrs. 5.1–5.4, Apelación, Apéndice, págs. 7–9), y (3) la Ley Habilitadora les viola el debido proceso de ley debido a cierta notificación inadecuada e incompleta (Párrs. 7.1–7.15, Apelación, Apéndice, págs. 10–14.)

El tribunal de instancia celebró una audiencia el 21 de septiembre de 2001, durante la cual las partes sometieron un escrito en conjunto titulado Estipulaciones de Hechos y Documentos. Entre los hechos jurídicos estipulados por las partes está el siguiente: "La Oficina de Gerencia y Presupuesto del E.L.A. establecerá con la marina de los Estados Unidos los acuerdos necesarios para el reembolso de estos gastos." Apelación, Apéndice, pág. 106. Dicha estipulación estaba acompañada de una carta de la Lcda. Melba Acosta,

Directora de la Oficina de Gerencia y Presupuesto (en adelante O.G.P.), a dichos efectos.

Los días 4 y 5 de octubre de 2001, se celebró una vista sobre la procedencia del entredicho preliminar para prohibir a la Comisión Estatal de Elecciones (en adelante C.E.E.) la impresión de las papeletas electorales el 6 de octubre, y el tribunal emitió una resolución y orden para detener todas las actividades de información, orientación e implantación del referéndum por parte de la C.E.E. La resolución del tribunal se fundamenta exclusivamente en la utilización de fondos estatales a manera de anticipo para subvencionar los costos del referéndum, aduciendo que el E.L.A. "no nos ha remitido a disposición legal o reglamentaria alguna de donde se derive la autoridad estatal en estas circunstancias para comprometer recursos públicos con miras a un futuro reembolso federal. Tampoco ha podido asegurar que ello en su día se produzca". Apelación, Apéndice, págs. 278–279.

Entendiendo que dicha resolución estaba basada en la impugnación de un hecho no controvertido y estipulado por las partes, el 8 de octubre, el E.L.A. presentó una moción de reconsideración en la cual alegó que tal resolución descansaba en una premisa equivocada. En la referida moción se hizo constar que una vez comprometidos y asignados los fondos federales, era una cuestión ministerial gestionar su traspaso, y que la cuenta que se hacía a nombre de la C.E.E., mediante un anticipo, era simplemente una ficción de contabilidad que permitía el uso por adelantado de dichos fondos federales para implantar el referéndum. La moción señala que la Ley Pública Núm. 106–246 de 13 de julio de 2000, 114 Stat. 511, firmada por el Presidente Clinton el 13 de julio de 2000 (Ley Inicial Asignando Fondos para Referéndum en Vieques), contiene disposiciones para que de los cuarenta millones de dólares ($40,000,000) de asistencia a Vieques se puedan transferir y comprometer fondos para un sinnúmero de fines, entre los que se en-

cuentra específicamente, que se lleve a cabo un referéndum para los residentes de Vieques. De igual manera, se acompañó una declaración jurada de la Lcda. Melba Acosta, Directora de la O.G.P., que relata las gestiones llevadas a cabo entre los Gobiernos de Estados Unidos y Puerto Rico para tramitar la transferencia de los fondos, y expresa que "nunca ha estado en tela de juicio las transferencias de fondos federales para sufragar los costos del referendum contemplado bajo la Ley 423". Apelación, Apéndice, pág. 291.

Al día siguiente, 9 de octubre, el E.L.A. presentó una moción supletoria, acompañando una carta del Comandante Kevin P. Green, del Comando Sur de las Fuerzas Navales de Estados Unidos, que reconoce la fuente congresional para el pago de los dineros para sufragar los costos del referéndum, y el compromiso de la Marina de Estados Unidos de así hacerlo, una vez se instrumenten los medios administrativos y logísticos para hacer la transferencia de fondos.

El 15 de octubre de 2001, el Tribunal de Primera Instancia finalmente emitió la sentencia cuya revisión es el objeto de este recurso. Mediante nuestra Resolución de 17 de octubre de 2001, notificada por facsímil ese mismo día, suspendimos los efectos de la orden de interdicto con el fin de que la C.E.E. reanudara los preparativos para llevar a cabo el referéndum el próximo 6 de noviembre de 2001. Concedimos, además, un término a las partes, que vencería dos (2) días más tarde, para someter sus respectivos alegatos. El recurso quedó sometido para resolución en los méritos, el 19 de octubre de 2001, a las 4:30 de la tarde, después que las partes sometieron tales alegatos. No obstante, en esta última fecha los recurridos solicitaron la desestimación del recurso alegando que este Tribunal carecía de jurisdicción para entender en él por razón de no haberse notificado a los Comisionados Electorales del Partido Po-

pular Democrático y del Partido Independentista Puertorriqueño. Concedido un nuevo término al E.L.A. para que se expresara sobre dicha moción, mediante nuestra Resolución de 24 de octubre de 2001, denegamos la moción.

El pasado 29 de octubre, el E.L.A. nos presentó una moción a los fines de informarnos de la decisión tomada por el Secretario de la Marina de posponer el referéndum para el 25 de enero de 2002. Asimismo, compareció nuevamente en esa misma fecha, la parte recurrida mediante un escrito titulado Moción en Auxilio de la Jurisdicción a los fines de solicitar la reconsideración de nuestra Resolución de 17 de octubre de 2001, en cuanto dejó en suspenso el *injunction* permanente decretado por el tribunal de instancia, por razón de la presentación del P. de la C. 1939 de 1ro de octubre de 2001, 14ta Asamblea Legislativa, 2da Sesión Ordinaria, hecha por varios miembros de la Cámara de Representantes, entre ellos su Presidente, para "conformar el asunto a presentarse en la consulta a los electores del Municipio de Vieques con lo dispuesto en la Ley Pública 106–398 ...". Alegato de los Peticionarios-Apelados, Apéndice, pág. 17. Aducen los recurridos que "[c]onsiderando el proyecto de ley presentado, esta Honorable Curia no tendrá que pasar juicio ... respecto a si el Artículo 4 de la Ley Núm. 423 se conforma a la Sección 1503(a)(1) de la Ley Pública Núm. 106–398 en cuanto al contenido de la consulta o de la papeleta que habrá de presentarse al electorado viequense ...". (Escolio omitido.) Moción en Auxilio de la Jurisdicción, pág. 3.

Mediante nuestra Resolución de 30 de octubre de 2001, concedimos un término simultáneo a todas las partes, que venció el pasado 1ro de noviembre para que se expresaran sobre la Moción Informativa del Procurador General y la Moción en Auxilio de Jurisdicción de la parte recurrida. Habiendo comparecido las partes mediante escritos sobre

este particular, por resolución separada emitida en el día de hoy hemos atendido el último de dichos escritos, declarando sin lugar la reconsideración solicitada en éste.

Estando, finalmente, en condición de resolver el presente recurso, procedemos a continuación a así hacerlo.

## II

El 31 de enero de 2000, el ex Presidente de Estados Unidos de América, William J. Clinton, emitió una Orden Presidencial que contenía unas directrices en torno a las actividades de la Marina en la isla de Vieques. Tales directrices presidenciales establecían, *inter alia*, la celebración de un referéndum en Vieques, dirigido a que los viequenses se expresaran mediante la selección de una de dos opciones o alternativas, su parecer sobre las prácticas militares en esa isla. El referéndum debería llevarse a cabo dentro de los doscientos setenta (270) días previos o siguientes al 1ro de mayo de 2001. La fecha exacta sería especificada por la Marina con por lo menos noventa (90) días de anticipación. Las alternativas por las que se votaría en el referéndum —según expresadas en las directrices— eran, la primera, el cese de las prácticas militares no más tarde del 1ro de mayo de 2003, y la segunda, la continuación de los entrenamientos, incluidas las prácticas militares con balas vivas, en los términos propuestos por la Marina, en próximas comunicaciones. La orden expresaba que la realización del referéndum dependía de la autorización, el apoyo y la cooperación del Gobierno de Puerto Rico. La implementación de las directrices, según se establecía específicamente en la orden, quedaba supeditada a que el Gobierno de Puerto Rico autorizara el referéndum y lo hiciera viable de acuerdo con sus leyes y reglamentos electorales. Véase 65 Fed. Reg. 5729 (2000).

El 13 de julio de 2000, el Congreso norteamericano aprobó la Ley Pública Núm. 106–246, *supra*, mediante la

cual se asignó la suma de cuarenta millones de dólares ($40,000,000) que serían transferidos a las agencias pertinentes del Gobierno de Estados Unidos, para llevar a cabo los proyectos que se describen en la ley relacionados con la isla de Vieques, entre éstos, el referéndum para que los residentes de Vieques se expresaran acerca del uso futuro de la isla para propósitos militares. ("[F]urther use of the island for military training programs ...". Íd., pág. 526.)

Así las cosas, el 27 de octubre de 2000, la Legislatura de Puerto Rico promulgó la Ley Núm. 423, *supra*, a los efectos de hacer viable la implantación de las directrices presidenciales. Casi paralelamente, el 30 de octubre de 2000, el Congreso norteamericano aprobó la Ley Pública Núm. 106–398 de 30 de octubre de 2000 (114 Stat. 1654). El título XV(¹) de esta ley trata en su mayoría sobre las actividades militares en Vieques. Provee para la celebración del mencionado referéndum y además establece los diferentes cursos de acción que seguir por el Presidente, de resultar escogida una u otra opción.

La ley específicamente excluye otra propuesta u opción que no sea la aprobación o desaprobación de la continuación de los entrenamientos de la Marina, según se describen en las Secs. 1503(a)(1) y 1503(d) de esta ley, 114 Stat. 1654A–351—1654A–352.

A los fines de aclarar varias de las disposiciones de la Ley Núm. 423, *supra*, y armonizarlas con las directrices

---

(¹) Los temas en torno a ese título eran los siguientes:

"Title XV– Navy activities on the Island of Vieques, Puerto Rico.

"*Sec. 1501. Assistance for Economic Growth on Vieques.*

"*Sec. 1502. Conveyance of Naval Ammunition Support Detachment, Vieques Island.*

"*Sec. 1503. Determination Regarding Continuation of Navy Training.*

"*Sec. 1504. Actions If Training Is Approved.*

"*Sec. 1505. Requirements If Training Is Not Approved or Mandate for Referendum Is Vitiated.*

"*Sec. 1506. Certain Properties Exempt from Conveyance or Transfer.*

"*Sec. 1507. Moratorium on Improvements at Fort Buchanan.*

"*Sec. 1508. Transfer and Management of Conservation Zones.*" 114 Stat. 1654A–348—1654A–357.

presidenciales y la Ley Pública Núm. 106–398, *supra*, el 28 de diciembre de 2000 la Asamblea Legislativa aprobó la Ley Núm. 457, *supra*, que enmendó varios artículos de la Ley Núm. 423, *supra*. Los electores registrados en el Municipio de Vieques debían seleccionar entre las dos opciones dispuestas en la Orden Presidencial de 31 de enero de 2000 y la Ley Pública Núm. 106–398, *supra*, según se declaran en la Ley Núm. 457, *supra*. Las opciones, según se establecen, son: (1) el cese de los entrenamientos de la Marina no más tarde de 1ro de mayo de 2003, y (2) la continuación de los entrenamientos, incluido el entrenamiento que utiliza municiones vivas, bajo los términos propuestos por la Marina.

El 11 de diciembre de 2000, el entonces Secretario de la Marina, Richard Danzig, le comunicó mediante carta al entonces Gobernador, Hon. Pedro Rosselló, la fecha de 6 de noviembre de 2001, como la fecha para llevarse a cabo el referéndum federal en el Municipio de Vieques. Además, expresó en dicha misiva que noventa (90) días antes de esa fecha, su oficina especificaría los términos para la opción número dos (2) en el referéndum, la cual permitiría los entrenamientos después de mayo de 2003.

El 13 de junio de 2001, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 34 de 13 de junio de 2001 (16 L.P.R.A. sec. 958 *et seq.*) a los fines de ofrecer una consulta bajo la Constitución y las leyes del E.L.A., independiente del referéndum pautado para el 6 de noviembre próximo. En ésta se ofrecería una tercera opción a las dos previamente estructuradas en las leyes federales, esto es, la terminación inmediata y permanente de los entrenamientos en la isla de Vieques. Véase Exposición de Motivos de la Ley Núm. 34 de 13 de junio de 2001, Leyes de Puerto Rico, pág. 192. La consulta se celebró el 29 de julio de 2001, y la opción de terminación inmediata y permanente resultó victoriosa, alcanzando el sesenta y ocho punto dos por ciento (68.2%) de los votos del pueblo viequense.

El 2 de agosto de 2001, Gordon England, Secretario de la Marina bajo la Administración del Presidente George W. Bush, apoyado en la autorización que a esos fines concedía la Sec. 1503 de la Ley Pública Núm. 106–398, *supra*, 114 Stat. 1654A–351, mediante comunicación escrita informó a la Gobernadora, Hon. Sila M. Calderón, las condiciones en las que se llevarían cabo las prácticas militares en el Municipio de Vieques, de resultar favorecida la alternativa de continuación permanente de las prácticas militares con balas vivas. ("I have directed Rear Admiral Green to work with your staff and the Commonwealth Elections Commission to incorporate these conditions into the ballot." Apéndice, pág. 188.)

La Gobernadora Calderón solicitó al Presidente de la C.E.E., Hon. Juan Melecio, que procediera con los trámites relacionados con el referéndum. El honorable Melecio remitió una comunicación a la O.G.P. solicitando el presupuesto para llevar a cabo el evento electoral. La O.G.P. le informó que el Gobierno federal reembolsaría los fondos utilizados para financiar el evento, que serían adelantados por el Secretario de Hacienda. El 8 de septiembre de 2001, la C.E.E. publicó la proclama del referéndum que se llevaría a cabo el 6 de noviembre de 2001.([2]) Así las cosas, el 13 de septiembre se presentó la acción de autos.

## III

El Tribunal de Primera Instancia concluyó que la Ley Núm. 423, *supra*, según enmendada, es inconstitucional. El foro a quo fundamentó su decisión en que existen diferencias irreconciliables entre las directrices presidenciales y la Ley Pública Núm. 106–398, *supra*, por lo que la ley

---

([2]) Como hemos mencionado, mediante la carta del Secretario de la Marina, Sr. Gordon England, de 25 de octubre de 2001, éste comunicó a la Gobernadora, Hon. Sila M. Calderón, su decisión de posponer el referéndum para el 25 de enero de 2002.

local que las hace viables resulta del todo incompatible y, por ende, viciada de inconstitucionalidad.

Aduce el aludido tribunal que a los electores viequenses se les estaría convocando para votar por dos alternativas, a pesar de que el estatuto federal sólo autoriza una opción exclusiva y mediante un formato igualmente exclusivo: la aprobación o desaprobación de la continuación de las prácticas con bala viva y cualquier otro tipo de entrenamiento por las Fuerzas Armadas en las facilidades de entrenamiento de la Marina. Además sostiene que el evento que promulga la ley local resulta distinto a lo provisto por la Ley Pública Núm. 106–398, *supra*, por cuanto no considera un pronunciamiento previo del Presidente de Estados Unidos en el que convoca la celebración del referéndum, además de que prescribe un componente de electores hábiles distinto a lo que informa dicha ley pública, por lo que se estaría financiando un evento con fondos públicos, en clara violación al estatuto que lo habilita y a ciertas disposiciones constitucionales específicas. Según el tribunal, la ausencia de fondos federales para sufragar el referéndum, y descartado su fin legítimo, hace que dicho evento electoral carezca de consecuencia jurídica. Expresa que sostener la celebración de un evento electoral que entraña tales inconsistencias con el estatuto del que reclama su procedencia, no salvaguarda el derecho fundamental de los electores de emitir un voto libre y eficaz.

Concluye que con las mencionadas actuaciones se han violado el Art. VI, Sec. 9 de nuestra Constitución, *supra*, que prohíbe la utilización de fondos públicos para fines que no sean públicos; el derecho al voto según se consagra en el Art. II, Sec. 2 de nuestra Constitución, *supra*; el derecho a la inviolabilidad de la dignidad del ser humano del Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, y al de un debido proceso de ley, Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

Conforme al Art. 22 de la propia Ley Núm. 423, *supra*, según enmendada, 16 L.P.R.A. sec. 957u, que dispone que será declarada inconstitucional la totalidad del estatuto en caso de la declaración de inconstitucionalidad de alguno de sus artículos, el tribunal a quo decretó la total inconstitucionalidad de la Ley Núm. 423, *supra*.

La sentencia de instancia intima que la Ley Pública Núm. 106–398, *supra*, tuvo el efecto de limitar la consulta a básicamente la segunda de las alternativas, esto es, la continuación de los entrenamientos, mediante una votación de aprobación o desaprobación. La sentencia concluye además, que varias de las disposiciones contenidas en las directrices presidenciales no se incluyeron más adelante en la Ley Pública Núm. 106–398, *supra*, y que en ningún lugar de ésta se hace referencia alguna a las directrices contenidas en la Orden Presidencial como documento jurídico suplementario. Según pronunció el tribunal de instancia, la ley posterior del Congreso federal se convirtió en fuente normativa y rectora, modificando en tal forma las directrices que, al parecer, ambas no pueden subsistir. Al ser el mismo Presidente Clinton autor de la Orden Presidencial, el que firma la referida ley, le permite inferir a dicho tribunal que el Presidente prestó su anuencia para alterar los términos previstos en sus propias directrices y modificar el estado de derecho vigente.

## IV

La decisión del tribunal sentenciador descansa sobre la premisa equivocada de que la Ley Núm. 423, según enmendada, *supra*, cumple con las directrices presidenciales pero no cumple con la Ley Pública Núm. 106–398, *supra* —que por ser posterior ocupó el campo— y que no hay forma de conciliar ambas leyes. La premisa inarticulada de esta posición es que al no seguir la letra del estatuto fede-

ral, la erogación de fondos por Estados Unidos, que establece la Ley Pública Núm. 106–398, *supra*, no se va a materializar, por lo que el gobierno del E.L.A. estaría erogando fondos públicos para una consulta local que no cumple con los requisitos de la federal, la cual a su vez no contiene la fórmula ya favorecida por el electorado viequense en el referéndum celebrado, por lo que no hay un fin público legítimo. Erró dicho tribunal al así decidir.

Ciertamente, las palabras utilizadas en las directrices presidenciales y en la Ley Pública Núm. 106–398, *supra*, en cuanto a las alternativas que se han de presentar al pueblo viequense, no son las mismas. Pero cabe preguntarse ¿resultan tan diametralmente distintas a lo intimado, tanto en substancia como en sus fines y medios, como para viciar de inconstitucionalidad el proceso que nos ocupa? Estimamos que no.

■ Directrices presidenciales[3] ordenaban la celebración de un referéndum para presentarle al pueblo viequense las siguientes opciones: (1) el cese de los entrenamientos de la Marina no más tarde de 1ro de mayo de 2003, y (2) la continuación de los entrenamientos, incluida la utilización de municiones vivas, bajo los términos propuestos por la Marina. La Ley Pública Núm. 106–398, *supra*,[4] provee la celebración de un referéndum donde los susodichos electores deben de escoger entre las alternati-

---

[3] "DIRECTIVE TO THE SECRETARY OF DEFENSE,
"DIRECTOR, OFFICE MANAGEMENT AND BUDGET
"SUBJECT: Resolution Regarding Use of Range Facilities on Vieques, Puerto Rico (Referendum)

. . . . . . . .

"1. The future of Navy training on Vieques will be determined by a referendum of the registered voters of Vieques, using Puerto Rico electoral laws and regulations as they exist as of the date of this directive. ...
"2. This referendum will present two alternatives. The first shall be that the Navy will cease all training not later than May 1, 2003. The second will permit continued training, to include live fire training, on terms proposed by the Navy. ..." Apelación, Apéndice, pág. 184.

[4] "*Sec. 1503. Determination Regarding Continuation of Navy Training*
"(a) Referendum.–

vas de aprobar o no aprobar la continuación de los ejercicios militares con bala viva y otros tipos de entrenamiento. Por tanto, un voto mayoritario a favor de la segunda de dichas alternativas equivale a una votación por la no continuación o descontinuación de los ejercicios militares, lo que equivale a una expresión a favor de la finalización, detención o el cese de los entrenamientos de la Marina de Guerra de Estados Unidos en la isla-municipio de Vieques. Esta ley federal también dispone sobre las consecuencias de que se escojan una u otra alternativa (aprobación o desaprobación de la continuación de los ejercicios, de la forma en que la Marina establezca). Específicamente determina cuál será la actuación del Presidente de Estados Unidos en uno u otro caso.(⁵)

■ La Ley Núm. 423, según enmendada, *supra*, se promulgó para hacer viable la celebración de un referéndum en Vieques, según dispuesto tanto por las directrices como por la Ley Pública Núm. 106–398, *supra*. Aunque utilizó el lenguaje de la Orden Presidencial en cuanto a la estructura o configuración de las alternativas, utilizó el lenguaje de la Ley Pública Núm. 106–398, *supra*, en

---

"(1) Requirement.– Except as provided in paragraph (2), the President shall provide for a referendum to be conducted on the island of Vieques, Puerto Rico, to determine by a majority of the votes cast in the referendum by the Vieques electorate whether the people of Vieques approve or disapprove of the continuation of the conduct of live-fire training, and any other types of training, by the Armed Forces at the Navy's training sites on the island under the conditions described in subsection (d).

.    .    .    .    .    .    .    .    .

"(d) Required Training Conditions. —For the purposes of the referendum under this section, the conditions for the continuation of the conduct of training are those that are proposed by the Secretary of the Navy and publicized on the island of Vieques in connection with, and for a reasonable period in advance of, the referendum. The conditions shall include the following:

"(1) Live-Fire Training. —A condition that the training may include live-fire training.

"(2) Maximum Annual Days of Use. —A condition that the training may be conducted on not more than 90 days each year."

(⁵) Véanse: Sec. 1504 ("Actions If Training Is Approved") y Sec. 1505 ("Requirements If Training Is Not Approved or Mandate for Referendum Is Vitiated"), Ley Pública Núm. 106–398, 114 Stat. 1654A–353 y 1654A–354.

cuanto a sus consecuencias, inclusiones, resultados y disposición.(⁶)

Esencialmente nos encontramos ante dos fuentes legales (una ley y una orden presidencial) que disponen ambas la creación de un referéndum para que el pueblo viequense se exprese sobre las actividades de la Marina de Guerra de Estados Unidos en la isla de Vieques. Las opciones que se delinean en ambas son conceptualmente correspondientes: la primera, negativa a la permanencia de este cuerpo naval; la segunda, positiva a esa permanencia.

El Tribunal de Primera Instancia entendió que la Ley Pública Núm. 106–398, *supra*, ofrecía al electorado una sola opción mientras que las directrices y la Ley Núm. 423, *supra*, local ofrecían dos alternativas. No podemos refrendar esa conclusión. El análisis de ambas leyes nos lleva a concluir, sin lugar a dudas, que los electores habrán de elegir entre dos opciones, la continuación o el cese de las prácticas de la Marina. Sólo esa conclusión es posible cuando surgen detalladamente del estatuto federal los cursos de acción que han de seguirse por el Presidente y el

---

(⁶) El Art. 4 de la Ley Núm. 423 (16 L.P.R.A. sec. 957c), según enmendada por la Ley Núm. 457 de 28 de diciembre de 2000, establece que en las papeletas aparecerán impresas las siguientes dos (2) alternativas:

"(a) En la parte superior de la columna izquierda, aparecerá impreso 'Cese de los entrenamientos de la Marina en Vieques/Navy will cease all training in Vieques'; seguido, en párrafo aparte y en los idiomas español e inglés, de lo siguiente: 'El cese de toda práctica militar por parte de la Marina en o antes del 1 de mayo de 2003. La transferencia de las tierras de la Marina de los Estados Unidos en toda la zona este de Vieques se hará a la jurisdicción administrativa del Secretario de lo Interior, quien retendrá y administrará dichos terrenos hasta que se apruebe una ley que estatuya lo pertinente a la disposición de dichas propiedades. El Gobierno Federal estará obligado a mitigar los daños ambientales según los términos de la Directriz Presidencial. De ninguna forma esta propiedad podrá ser destinada en un futuro para uso por el Departamento de la Defensa a uso militar alguno.'

"(b) En la parte superior de la columna derecha, aparecerá impreso 'Continuación de los Entrenamientos de la Marina en Vieques/Continued Navy training on Vieques'; seguido, en párrafo aparte y en los idiomas español e inglés, de lo siguiente: 'La Marina de los Estados Unidos continuará llevando a cabo entrenamientos en Vieques utilizando balas vivas. Los ciudadanos de Vieques recibirán ayuda económica para ellos y sus comunidades, de unos cincuenta millones (50,000,000) de dólares que han sido autorizados para destinarse al Presidente para tales fines, además de una cantidad de cuarenta millones (40,000,000) de dólares según autorizado por la Ley Pública 106–398 de 30 de octubre de 2000.' "

Secretario de la Defensa en caso de que los electores viequenses elijan una u otra opción. Véanse Secs. 1504–1505, 114 Stat. 1654A–353—1654A–354. La Sec. 1505(b)(1), 114 Stat. 1654A–353, establece que de ser escogida la opción del cese de los entrenamientos militares ("Requirements if training is not approved"), el Secretario de la Defensa finalizará toda operación de entrenamiento militar ("all Navy and Marine Corps") en Vieques no más tarde de 1ro de mayo de 2003.

■ La disposición de la Sec. 1503(b) de la Ley Pública Núm. 106–398, *supra*, 114 Stat. 1654A–352, a los efectos de que el electorado sólo podrá evaluar las opciones de aprobar o desaprobar las prácticas de la Marina,(⁷) no queda afectada por el hecho de que la Ley Núm. 423, según enmendada, *supra*, disponga que cada papeleta contenga una explicación del alcance y las consecuencias de cada opción según surgen de las claras disposiciones de la Ley Pública Núm. 106–398, *supra*. Dicho estatuto federal nada provee que sea contrario a esos efectos.

La sentencia del Tribunal de Primera Instancia articula, además, que la Sec. 1503 de la Ley Pública Núm. 106–398, *supra*,(⁸) dispone que el Presidente convocará el referéndum y que no ha habido tal convocatoria. El Procurador General sostiene que el Presidente convocó el referéndum a través del Secretario de la Marina.

■ La disposición de la Sec. 1503(a) de la Ley Pública Núm. 106–398, *supra*, requiere que el Presidente provea ("shall provide for") o haga viable una consulta a los viequenses y a esos fines le impone un deber ministerial. Pero

---

(⁷) "[N]o proposition or option may be presented as an alternative to the propositions of approval and of disapproval of the continuation of the conduct of training as described in subsection (a)(1)." 114 Stat. 1654A–352.

(⁸) *"Sec. 1503 Determination Regarding Continuation of Navy Training.*

"(a) Referendum.–

"(1) Requirement.– Except as provided in paragraph (2), the *President shall provide* for a referendum to be conducted on the island of Vieques, Puerto Rico ...." (Énfasis suplido.) 114 Stat. 1654A–351.

no requiere que sea a través de un documento específico como, a modo de comparación, el que le impone al Presidente en su Sec. 1503(e),([9]) 114 Stat. 1654A–352, para determinar y emitir una proclama en la que anuncie el resultado (desenlace) del referéndum. Tanto la administración del Presidente Clinton como la del Presidente Bush han cumplido con el deber impuesto por la Ley Pública Núm. 106–398, *supra*, los que a través de los organismos concernidos han continuado realizando gestiones afirmativas a los efectos de promover el referéndum.

## V

El Tribunal de Primera Instancia aduce como razón adicional a su decisión que la Ley Núm. 423, *supra*, aporta una definición distinta de electores hábiles al que establece la ley federal. A ello riposta el señor Procurador General que la definición de *electores hábiles* bajo la Ley Pública Núm. 106–398, *supra*, es compatible con la definición de *electores* bajo el estatuto local.

■ La ley federal dispone que los electores en el referéndum serán (1) residentes de Vieques, (2) que aparezcan registrados para votar en una elección general —autorizados para votar por el Comisionado Residente del E.L.A.— a las fechas especificadas en el párrafo 2 (esto es, 7 de noviembre de 2000 o aquella fecha que sea ciento ochenta (180) días antes de la fecha en que se llevará a cabo el referéndum, o ambas fechas). Sec. 1503(f) de la Ley Pública Núm. 106–398, *supra*, 114 Stat. 1654A–352. Esa fecha se cumplía el 6 de mayo de 2001.

■ Por otro lado, la Ley Núm. 423, según enmen-

---

([9]) "(e) Proclamation of Outcome. —Promptly after the referendum is completed under this section, the President shall determine, and issue a proclamation declaring the outcome of the referendum. The President's determination shall be final, and the outcome of the referendum (as so determined) shall be binding." 114 Stat. 1654A–352.

dada, *supra*, en su Art. 7 (16 L.P.R.A. sec. 957f), dispone que los electores serán: (1) electores *bona fide* del Municipio de Vieques, debidamente calificados como tales conforme a las disposiciones, fechas límites y términos de la Ley Electoral de Puerto Rico y sus reglamentos.

> La Comisión Estatal de Elecciones incluirá en la lista de votantes a todos aquellos electores con récord activo que a la fecha del referéndum hayan cumplido dieciocho (18) años de edad y formen parte del registro electoral de Vieques, de conformidad con las disposiciones, fechas límites y términos de las secs. 3001 *et seq.* de este título y sus Reglamentos. Toda solicitud de transacción electoral en Vieques, después luego de las elecciones generales del 7 de noviembre de 2000 y hasta la fecha en que se celebre el referéndum dispuesto en este Ley capítulo, deberá hacerse mediante declaración jurada so pena de perjurio, ante notario público designado y pagado por la Comisión Estatal de Elecciones en la Junta de Inscripción Permanente de Vieques. ... Art. 7, Ley Núm. 423, según enmendada, *supra*.

Tiene razón el Procurador General al aducir que ambas definiciones son compatibles. Como bien sostiene éste, al amparo de la Ley Electoral de Puerto Rico sólo tienen derecho a votar en una elección aquellos electores que figuren en el Registro de Electores. Véase 16 L.P.R.A. sec. 3203. Éstos son aquellos que participaron en la última elección general anterior a los comicios en cuestión, y los que se hayan inscrito en el Registro Electoral posteriormente a través de los mecanismos provistos por la C.E.E. En el caso de los electores viequenses, la C.E.E. acordó que, además de los electores que figuren en el Registro de Electores al 7 de noviembre de 2000, según dispone el estatuto federal, tendrán derecho a votar en el referéndum sobre el futuro de los ejercicios de la Marina los electores debidamente inscritos y activos en el Registro Electoral al 7 de octubre de 2001, o sea treinta (30) días antes de dicho referéndum, y que a la fecha del referéndum hayan cumplido dieciocho (18) años de edad. Mediante el referido acuerdo podrán también votar aquellos electores

que votaron en el referéndum celebrado el 29 de julio, aunque no hubieran votado en las elecciones generales del pasado 6 de noviembre. Véase 16 L.P.R.A. secs. 3003(52) y 3062. En resumen, estarán inscritos, y por lo tanto activos en el Registro Electoral de Vieques: (1) los electores que votaron en las elecciones generales de 2000 (hayan votado o no en el referéndum de julio); (2) los que votaron en el referéndum de julio pasado (hayan votado o no en las elecciones generales de 2000); (3) los que se hayan inscrito después del referéndum celebrado en julio, pero en o antes de 7 de octubre de 2001.

■ Aunque el estatuto federal sólo ordena que los electores sean residentes de Vieques y que estén registrados al *7 de noviembre de 2000*, conforme a la Ley Electoral vigente, la Ley Núm. 423, *supra,* incluye a los electores previstos por la ley federal, pero es aún más abarcadora que ésta, ya que permite que los electores activados después de 6 de mayo de 2001 (ciento ochenta (180) días antes) participen también en el referéndum. No existiendo una disposición federal en contrario, el derecho electoral aplicable en el referéndum es la Ley Electoral de Puerto Rico, por disposición expresa de la Ley Núm. 423, *supra,* y por la directriz presidencial de 31 de enero de 2000. Según expresa el señor Procurador, ello es compatible con la tradición norteamericana de que los comicios federales se organicen bajo las leyes electorales de los distintos estados. *Ex Parte Yarbrough,* 110 U.S. 651 (1884); *Gray v. Sanders,* 372 U.S. 368, 379 (1963); *Katzenbach v. Morgan,* 384 U.S. 641, 647 (1966).

> The methods by which the people of Puerto Rico and their representatives have chosen to structure the Commonwealth's electoral system are entitled to substantial deference. ...
>
> .     .     .     .     .     .     .
>
> Absent some clear constitutional limitation, Puerto Rico is free to structure its political system to meet its "special concerns and political circumstances". *Rodríguez v. Popular Democratic Party,* 457 U.S. 1, 8, 13–14 (1982).

■ Como dijimos en *Ramírez de Ferrer v. Mari Brás*, 144 D.P.R. 141, 171 (1997), "el E.L.A. tiene, cuando menos, los mismos poderes legislativos que un estado de la Unión [en cuanto a]l poder de reglamentar el sufragio en el país". (Énfasis suprimido.)

■ Conforme a la doctrina constitucional norteamericana, el derecho a votar libremente en Puerto Rico constituye un derecho político fundamental. Véase *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 88 (1980), de donde citamos:

> ... la tarea primordial de la revisión judicial es la remoción de obstrucciones en el proceso democrático. La denegación del voto parece ser la quintaesencia de esas obstrucciones. J. Hart Ely, *Democracy and Distrust: A Theory of Judicial Review*, Cambridge, Mass., Harvard U. Press, 1980, pág. 117.

En *Dunn v. Blumstein*, 405 U.S. 330 (1972), el Tribunal Supremo de Estados Unidos invalidó, expresamente, un estatuto de Tennessee que imponía como condición para votar el requisito de haber residido en el estado un (1) año y en el condado tres (3) meses, inmediatamente antes de las elecciones, al concluir que el estatuto violaba la igual protección de las leyes. *El Tribunal estimó que no existía un interés apremiante del Estado en imponer términos tan largos.* A la luz de dicha opinión, el Tribunal Supremo de Estados Unidos resolvió los casos *Ferguson et al. v. Williams, Governor of Mississippi, et al.*, 405 U.S. 1036 (1972); *Marston v. Lewis*, 410 U.S. 679 (1973), y *Burns v. Fortson*, 410 U.S. 686 (1973), en los cuales enfrentó *el problema de la fecha apropiada para el cierre de las inscripciones.* En *Ferguson et al. v. Williams, Governor of Mississippi, et al.*, supra, el Tribunal dejó sin efecto un fallo de un tribunal de tres (3) jueces que resolvió que era válido constitucionalmente el cierre de las inscripciones cuatro (4) meses antes de la elección, y devolvió el caso a instancia para su consideración a la luz del caso *Dunn v. Blumstein*, supra. Aunque tanto en *Marston v. Lewis*, su-

pra, como en *Burns v. Fortson,* supra, el Tribunal Supremo federal resolvió que sendos términos de cincuenta (50) días entre la última fecha de inscripción y el evento electoral, eran permisibles desde el punto de vista constitucional, en este último expresó que tal período "se acerca a los linderos constitucionales extremos en este campo ...". *Burns v. Fortson,* supra, pág. 687.

Es conforme a dicha jurisprudencia federal que en 1980 resolvimos el caso *Ortiz Angleró v. Barreto Pérez,* supra. En la opinión que emitiéramos en ese caso por voz del entonces Juez Presidente Señor Trías Monge, luego de hacer un recuento de los casos federales sobre el particular, llegamos a la conclusión de que una resolución conjunta que disponía un término de ciento cincuenta y tres (153) días entre el cierre de las inscripciones y la fecha de celebración de un referéndum para enmendar nuestra Constitución a los fines de limitar el derecho a fianza, era inconstitucional por restringir irrazonablemente el acceso de los electores al Registro Electoral a los fines de participar en dicho referéndum.

Por tanto, tenemos que necesariamente concluir, por ser inescapable dicha conclusión conforme tanto a la doctrina federal como a la nuestra, según han quedado éstas reseñadas, que el estatuto federal que provee para la celebración del referéndum de 6 de noviembre, establece un punto de partida como requisito mínimo que no impide a la Asamblea Legislativa de Puerto Rico adoptar, como en efecto adoptó por medio de la Ley Núm. 423, *supra,* una medida que garantiza plenamente el derecho al sufragio a un mayor número de votantes legalmente cualificados, salvando de este modo cualquier defecto constitucional que hubiera podido oponerse al estatuto federal.

El hecho de que el estatuto local permita la participación de un mayor número de electores *bona fide* que los previstos en el estatuto federal, no puede ser razón para declararlo nulo, y por ende, decretar la suspensión del

referéndum, como tampoco puede interpretarse para socavar la obligatoriedad de los resultados de dicha consulta electoral. Por el contrario, el estatuto local propende a garantizar una mayor confiabilidad al evento electoral de marras, por lo que no podemos discernir conflicto sustancial alguno entre ambos estatutos en este sentido.

## VI

El Art. 21 de la Ley Núm. 423, según enmendada, *supra*, dispone que el Congreso de Estados Unidos asignará fondos federales para llevar a cabo el referéndum. Por tanto, el Tribunal de Primera Instancia concluyó que la celebración del referéndum mediante la utilización de fondos del Estado Libre Asociado, no sólo constituye una violación a la Ley Núm. 423, *supra*, sino que infringe el Art. VI, Sec. 9 de nuestra Constitución, *supra*.

La Ley Pública Núm. 106–246, *supra*, en su sección sobre *Operation Maintenance, Defense-Wide* ("including transfer of funds") asignó la cantidad de cuarenta millones (40,000,000) de dólares a la Marina para que sean destinados a ciertos usos específicos con relación a Vieques, entre los que se detalla "and conducting a referendum among the residents of Vieques regarding further use of the island for military training programs". Íd., pág. 526. Esta asignación de fondos ha sido reconocida en leyes posteriores. Ley Pública Núm. 106–398, *supra.* Surge de los autos que las partes estipularon ante el Tribunal de Primera Instancia que el Secretario de Hacienda adelantará la cantidad de seiscientos setenta y tres mil (673,000) dólares a la C.E.E., y la Oficina de Gerencia y Presupuesto del E.L.A. establecerá con la Marina de Estados Unidos los acuerdos necesarios para el reembolso de esta cantidad. Mediante comunicación escrita de 5 de septiembre de 2001, a la Gobernadora de Puerto Rico, Hon. Sila M. Calderón, con copia al Hon. Juan R. Melecio, el Comandante Kevin P. Green, de la Ma-

rina de Estados Unidos, detalló varias de las iniciativas preparatorias para el evento electoral y reiteró la disposición del Gobierno federal de aportar los fondos. La transferencia de fondos federales mediante el método de reembolso es un mecanismo común en las relaciones entre las autoridades federales y el Gobierno de Puerto Rico. Consecuentemente, no le asiste la razón al tribunal de instancia al concluir que el mencionado referéndum será costeado con fondos del E.L.A.

No podemos estar ajenos al hecho de que el estatuto impugnado fue aprobado con el propósito de hacer viable la consulta solicitada por el Gobierno federal. Tampoco podemos ignorar que, para ofrecer a los residentes de Vieques la oportunidad de expresarse sobre una opción que no fue incluida por el Congreso de Estados Unidos en el estatuto que provee para el próximo referéndum, se aprobó por la Legislatura de Puerto Rico, la Ley Núm. 34 de 13 de junio de 2001, que culminó en el proceso de votación de 29 de julio de 2000, con el resultado de que la referida opción obtuvo la mayoría de los votos. El referéndum que sería celebrado en el próximo mes de noviembre fue gestionado por el Gobierno federal y va a ser financiado, en última instancia, con fondos federales ya separados para esos efectos. Por tanto, no es necesario extendernos para concluir que incidió el tribunal sentenciador al concluir que habrán de utilizarse fondos del E.L.A. para financiar una actividad carente de un fin público. Ambas premisas son erróneas.

▆▆▆ El interés del Estado al aprobar esta legislación que hace viable el referéndum es legítimo y apremiante, al ofrecerles a los viequenses la oportunidad de decidir si desean que la Marina venga obligada a cesar los ejercicios bélicos en o antes de 1ro de mayo de 2003. Las dos opciones son las únicas que está dispuesto a aceptar el Congreso. La legislación ahora impugnada no persigue auscultar la opinión del electorado de Vieques respecto a otras opciones,

como fue el propósito de la Ley Núm. 34, *supra*, sino adoptar los parámetros provistos por la ley federal. Forzoso es también concluir que el evidente propósito que la Ley Núm. 423, *supra*, constituye un fin eminentemente público.

## VII

Por último, alegan los demandantes recurridos que conforme resolvimos en *Sánchez y Colón v. E.L.A. I*, supra, y *Sánchez y Colón v. E.L.A. II*, 134 D.P.R. 503 (1993), la Ley Núm. 423, según enmendada, *supra*, es inconstitucional por no incluir la opción que ellos favorecen. *Sánchez y Colón v. E.L.A. I*, supra, es distinguible del caso de autos; allí el referéndum trataba de fórmulas de *status* político, razón por la cual aplicamos un escrutinio riguroso ya que involucraba el derecho del pueblo a definir su relación política con Estados Unidos. La Ley Núm. 423, *supra*, sólo fue aprobada para hacer viable la consulta prevista en el estatuto federal; es este último el que elabora los aspectos sustantivos de la consulta.

La Legislatura goza de amplia facultad para reglamentar los eventos electorales y ello, por su naturaleza, tiene el efecto de restringir e imponer cargas sobre el derecho a participar en el evento electoral. Según hemos señalado, el interés del Estado no es el de auscultar el sentir de los viequenses respecto a todas las posibles alternativas para solucionar el conflicto entre los residentes de Vieques y la Marina. Los demandantes recurridos ya tuvieron la oportunidad de expresarse al votar sobre la opción de su preferencia en el referéndum celebrado el 29 de julio al amparo de las disposiciones de la Ley Núm. 34, *supra*. Como ha quedado dicho, el estatuto local impugnado pretende habilitar el referéndum dispuesto por la ley federal con el propósito de decidir específicamente si la Marina ha

de continuar o no sus ejercicios bélicos después de 1ro de mayo de 2003.

## VIII

Las demás alegaciones contenidas en la petición presentada por los demandantes recurridos ante el tribunal de instancia se han tornado académicas. Éstas se limitan a señalar que la C.E.E. les privó del debido proceso de ley al no publicar una proclama para anunciar el referéndum con sesenta (60) días de antelación a la fecha de su celebración (Art. 6 de la Ley Núm. 423, *supra*, 16 L.P.R.A. sec. 957e) y que la C.E.E. no comenzó una campaña de orientación cincuenta y cinco (55) días antes del referéndum (Art. 8 de la Ley Núm. 423, *supra*, 16 L.P.R.A. sec. 957g). Ante la decisión tomada por el señor Secretario de la Marina de posponer para el 25 de enero próximo dicha consulta electoral, no es necesario entrar a considerar tales alegaciones.

## IX

En conformidad con lo resuelto anteriormente, *se dictará sentencia para revocar aquella dictada por el Tribunal de Primera Instancia el 15 de octubre de 2001 y, en consecuencia, decretar la desestimación de la petición presentada ante dicho tribunal en este caso, en todas sus partes.*

El Juez Asociado Señor Rivera Pérez concurrió con el resultado porque concluye que el Art. 7 de la Ley Núm. 423 de 27 de octubre de 2000, según enmendada, 16 L.P.R.A. sec. 957f, fue desplazada por la Sec. 1503(f)(1) y (2) de la Ley Pública Núm. 106–398, 114 Stat. 1654A–352, la cual ocupó el campo, por ser las disposiciones de la ley estatal contrarias a las disposiciones del estatuto federal. Véase *Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355 (1986). El Congreso federal estableció en esa sección los requisitos para ser elector en este referéndum, de acuerdo

con su autoridad constitucional para regular las elecciones y consultas federales. Véase Art. I, Sec. 4, Cl.1 de la Constitución de Estados Unidos de América; *Burroughs and Cannon v. U.S.*, 290 U.S. 534 (1934); *United States v. Classic*, 313 U.S. 299 (1941); *Foster v. Love*, 522 U.S. 67 (1997); *Association of Community Organizations v. Miller*, 129 F.3d 833 (6to Cir. 1997). El criterio sobre elegibilidad de los electores que podrán participar en el referéndum del 25 de enero de 2002 está regulado por la ley federal antes citada, la cual dispone que serán elegibles para votar los electores del Municipio de Vieques registrados para votar por el Comisionado Residente en Washington para el 7 de noviembre de 2000, y aquellos que se registraron como electores luego del 7 de noviembre de 2000, pero ciento ochenta (180) días antes de la celebración del referéndum. Véase *Foster v. Love*, supra. Como consecuencia se podrían recusar los votos de todos aquellos electores viequenses que se hayan inscrito dentro del período de ciento ochenta (180) días anteriores al referéndum, o sea, después de 28 de julio de 2001, y que ejerzan su voto en éste.